191 Cal.App.3d 1318 (1987)
237 Cal. Rptr. 92
EXPEDITO A. IBARBIA Plaintiff and Appellant,
v.
THE REGENTS OF THE UNIVERSITY OF CALIFORNIA et al., Defendants and Respondents.
Docket No. A032308.
Court of Appeals of California, First District, Division Three.
May 15, 1987.
*1321 COUNSEL
Expedito A. Ibarbia, in pro. per., for Plaintiff and Appellant.
James C. Martin, Lucy Ablan and Crosby, Heafey, Roach & May for Defendants and Respondents.
OPINION
MERRILL, J.
The instant case is an employment discrimination action filed under the California Fair Employment and Housing Act (FEHA)[1] (Gov. Code, § 12900 et seq.).[2] Appellant Expedito Ibarbia, a Filipino-American, claims employment discrimination based on his national origin. A summary judgment was entered against appellant below on respondents' motion. Appellant filed this appeal in propria persona from the summary judgment.

*1322 I
The case stems from appellant's unsuccessful bid for the position of farm advisor with the Cooperative Extension, a part of the University of California's Division of Agricultural Services.
The Cooperative Extension was formed for the purpose of disseminating practical agricultural information and services to farmers and residents throughout the state. It accomplishes this through the employment of county "extension" offices and farm advisors who work directly with the agricultural community as teachers, problem solvers and consultants. Typically, a county extension office will have separate farm advisors for vegetable crops, field crops and livestock.
In 1979, the Yolo County Cooperative Extension office had an opening for a farm advisor on vegetable crops. County Director Carl Schoner and Assistant Director Roy Rauschkolb prepared a position vacancy announcement describing the position and listing qualifications required of applicants. In August 1979, Agriculture and University Services Personnel Administrator Kendall Engelund circulated the announcement and formed a "search committee" for the purpose of screening applicants. The committee consisted of Chairperson Thomas Kearney, the Yolo County farm advisor for field crops; Robert Mullen, the San Joaquin County farm advisor on vegetable crops; Marsha Campbell, the Stanislaus County farm advisor for field crops; and Thomas Aldrich, the Colusa County Cooperative Extension director.
Closing date for receiving applications for the position was listed as October 15, 1979. Engelund's office received a total of 21 applications. Appellant's application and cover letter were received on October 22, 1979.
The search committee used a set of criteria as a basis for evaluating the applications. Included in these criteria were such factors as farm experience, experience in commercial vegetable crop production, a master's degree, knowledge of statistics, knowledge of extension methods, knowledge of economics of farm management, letters of recommendation, and knowledge of California agricultural conditions. Additionally, affirmative action considerations constituted 10 percent of the weight in the valuation process.
Although appellant's application was received after the closing date, it was considered by the committee along with the others. On the basis of the above criteria, the committee selected four finalists for interviews. Appellant was *1323 not among those selected. Appellant was notified by letter, dated November 26, 1979, that while the position had "not yet been filled," he had not been selected as a finalist.
The four finalists were interviewed on November 19. Following the interviews, the committee and County Director Schoner agreed on one applicant, Eugene Miyao (an Asian-American of Japanese descent), as the most qualified candidate for the position. Miyao is a former tomato farmer from Yolo County, and thus was already familiar with the pertinent clientele and vegetable crop production. Schoner and the committee recommended to Assistant Director Rauschkolb that Miyao be hired for the position.
By letter of November 29, 1979, appellant notified Personnel Administrator Engelund that he viewed the rejection of his application as "another instance of the University's continuing discrimination against Filipino-Americans." The letter repeated appellant's qualifications and challenged Engelund "to show me any finalist who has a better record than mine ... in extension related areas." Engelund responded to the letter advising appellant that he had initiated a review of the selection process and that the position had not yet been filled pending resolution of appellant's inquiry.
A review of the selection process uncovered the reasons for appellant's rejection. The reasons noted on the committee's report were appellant's apparent unwillingness to live in the geographical area in which the position was located, plus lack of field and practical experience. The committee chairperson further pointed out that appellant's application listed no farm background or commercial vegetable crop experience, little if any knowledge of extension methods, and no indication of any economics training. Additionally, appellant's most recent work experience as an agricultural inspector had been discredited by both the committee chairperson and Schoner who did not consider such law enforcement experience to be valuable preparation for the educational and consulting work of a farm advisor. Appellant had been given the full 10 percent credit for affirmative action consideration.
The review, however, also disclosed a discrepancy between the committee's criteria in evaluating the applications and the qualifications listed in the position vacancy announcement. On the basis of this discrepancy, Dr. Jerome Siebert, then assistant vice president of the Cooperative Extension, directed the committee to reevaluate the criteria and make them conform more with the qualifications listed in the announcement, and then resubmit a recommendation with an analysis of all candidates including appellant.
*1324 After modifying the criteria to conform with the announcement, appellant was determined to be the fourth-ranked finalist. Based on this turn of events, appellant was offered an interview by phone on January 29, 1980, but declined. Appellant said he declined the interview in view of the fact that he had filed a complaint against the Cooperative Extension with the Equal Employment Opportunity Commission (EEOC)[3] and did not believe that the interview would be fair.
Thereafter, Personnel Administrator Engelund wrote appellant telling him that since he had declined an interview, the search committee would proceed to recommend a candidate for the farm advisor position. Once again the committee recommended Eugene Miyao who accepted the job offer.
On October 27, 1980, following its investigation of the case, the EEOC issued a finding that there was no reasonable cause to believe that the university denied appellant an interview and refused to hire him because of his national origin. On November 15, 1980, the California Department of Fair Employment and Housing (Department), having "reviewed and accepted the determination made by the [EEOC]," notified appellant in writing that the case had been closed and advising him of his right to sue within a year of the notice.
On November 6, 1981, appellant filed the instant action against the university, Siebert, Engelund and Schoner. In his complaint, he alleges discrimination based on national origin in the rejection of his application for the Yolo County farm advisor position. Additionally, he alleges systematic discrimination on the part of respondents against Filipino-Americans in general, both historically and at the present time.
Respondents answered the complaint denying any discrimination on their part. Discovery proceeded until cross-motions for summary judgment were filed in 1985. Appellant's motion was heard first and subsequently denied. Respondents' motion was then heard and granted.

II
The sole issue on appeal is whether the trial court erred in granting respondents' motion for summary judgment. However, prior to reaching that issue, a brief summary of the law under which the instant action is brought, is in order. "The California Fair Employment Practices Act (FEPA) was enacted in 1959 (former Lab. Code, § 1410 et seq.; see Stats. 1959, ch. 121, § 1, *1325 p. 2000 et seq.). In 1980 it was recodified as part of the FEHA. (Stats. 1980, ch. 992, § 4, p. 3140 et seq.) The law establishes that freedom from job discrimination on specified grounds, including [national origin], is a civil right. (§ 12921.) It declares that such discrimination is against public policy (§ 12920) and an unlawful employment practice (§ 12940).[4]
"The statute creates a Department of Fair Employment and Housing (Department) (§ 12901), whose function is to investigate, conciliate, and seek redress of claimed discrimination (§ 12930). Aggrieved persons may file complaints with the Department (§ 12960), which must promptly investigate (§ 12963). If it deems a claim valid it seeks to resolve the matter  in confidence  by conference, conciliation, and persuasion. (§ 12963.7.) If that fails or seems inappropriate the Department may issue an accusation to be heard by the Fair Employment and Housing Commission.... (§§ 12965, subd. (a), 12969; see too § 12903.)
"The Commission determines whether an accused employer, union, or employment agency has violated the act. If it finds a violation it must `issue ... an order requiring such [violator] to cease and desist from such unlawful practice and to take such action, including, but not limited to, hiring, reinstatement or upgrading of employees, with or without back pay, restoration to membership in any respondent labor organization, as, in the judgment of the commission, will effectuate the purpose of this part....' (§ 12970, subd. (a).)
"If no accusation is issued within 150 days after the filing of the complaint and the matter is not otherwise resolved, the Department must give complainant a right-to-sue letter. Only then may that person sue in the superior court `under this part' (§ 12965, subd. (b))." (Commodore Home Systems, Inc. v. Superior Court (1982) 32 Cal.3d 211, 213-214 [185 Cal. Rptr. 270, 649 P.2d 912.)
In the instant case, appellant filed a complaint with the Department. After considering the complaint, the Department declined to issue an accusation in the case and sent appellant a right-to-sue letter instead.

*1326 III
Summary judgment is authorized by Code of Civil Procedure section 437c, subdivision (c), which provides, in relevant part, that a motion for summary judgment "shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."
(1) The basis for our review has been stated by our Supreme Court as follows: "We have summarized the well-established rules governing summary judgment procedure as follows: `"The matter to be determined by the trial court in considering such a motion is whether the defendant (or the plaintiff) has presented any facts which give rise to a triable issue. The court may not pass upon the issue itself. Summary judgment is proper only if the affidavits in support of the moving party would be sufficient to sustain a judgment in his favor and his opponent does not by affidavit show such facts as may be deemed by the judge hearing the motion sufficient to present a triable issue. The aim of the procedure is to discover, through the media of affidavits, whether the parties possess evidence requiring the weighing procedures of a trial. (2) In examining the sufficiency of affidavits filed in connection with the motion, the affidavits of the moving party are strictly construed and those of his opponent liberally construed, and doubts as to the propriety of granting the motion should be resolved in favor of the party opposing the motion. Such summary procedure is drastic and should be used with caution so that it does not become a substitute for the open trial method of determining facts."'" (Empire West v. Southern California Gas Co. (1974) 12 Cal.3d 805, 808 [117 Cal. Rptr. 423, 528 P.2d 31].)
Having reviewed all the pertinent papers, we find no error on the part of the trial court in granting summary judgment in favor of respondents.

IV
There appears to be a dearth of decisional law on the subject of how one goes about establishing a case of employment discrimination under the FEHA. Accordingly, we begin our analysis with a look at federal law[5] and *1327 how the same subject is broached under the FEHA's federal counterpart, title VII of the Civil Rights Act of 1964.[6]
(3) Claims of employment discrimination because of race or national origin may be pursued under title VII in two different ways. "An individual may allege that he has been subjected to `disparate treatment' because of his race, or that he has been the victim of a facially neutral practice having a `disparate impact on his racial group." (Furnco Construction Corp. v. Waters (1978) 438 U.S. 567, 582 [57 L.Ed.2d 957, 970, 98 S.Ct. 2943].) To overcome defendant's motion for summary judgment, under either theory, plaintiff has to offer facts sufficient to establish a prima facie case. (McDonnell Douglas Corp. v. Green (1973) 411 U.S. 792, 802 [36 L.Ed.2d 668, 677-678, 93 S.Ct. 1817]; Griggs v. Duke Power Co. (1971) 401 U.S. 424, 431 [28 L.Ed.2d 158, 164, 91 S.Ct. 849].)
(4) To establish a prima facie case of employment discrimination through disparate treatment, plaintiff has to show: "(i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications." (McDonnell Douglas Corp. v. Green, supra, 411 U.S. at p. 802 [36 L.Ed. at p. 677], italics added, fn. omitted.) This is not intended to be an inflexible rule. "The facts necessarily will vary in [t]itle VII cases, and the specification above of the prima facie proof ... is not necessarily applicable in every respect to differing factual situations." (Id., fn. 13 [36 L.Ed. at pp. 677-678].) What is clear, however, is that "a [t]itle VII plaintiff carries the initial burden of showing actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were `based on a discriminatory criterion illegal under the *1328 Act.' [Citation.]" (Furnco Construction Corp. v. Waters, supra, 438 U.S. at p. 576 [57 L.Ed.2d at p. 966].) (5a) To establish a prima facie case of employment discrimination through disparate impact, on the other hand, plaintiff need not show that the employer had a discriminatory intent but need only demonstrate that a particular practice in actuality operates to exclude members of his race. (Griggs v. Duke Power Co., supra, 401 U.S. at p. 431 [28 L.Ed.2d at p. 164].)
(6) The approach followed by the California Fair Employment and Housing Commission (Commission) which hears FEHA cases, resembles the federal approach. It too has adopted the disparate treatment/disparate impact theories of employment discrimination. The primary difference is one that does not concern us in our case. Under the Commission's approach, in order to establish a prima facie case of disparate treatment, a complainant must show that a causal connection exists between his protected status and the adverse employment decision. "The Commission has stated that this causal connection or nexus can be proved by establishing facts that create an inference of discrimination, as in McDonnell Douglas Corp. v. Green, or by a showing of actual bias against complainant's group, or by other competent evidence. [¶] ... Thus the Commission's position is that McDonnell Douglas Corp. v. Green sets out but one way of raising an inference of discrimination." (Gelb & Frankfurt, California's Fair Employment and Housing Act: A Viable State Remedy for Employment Discrimination (1983) 34 Hastings L.J. 1055, 1070, fns. omitted.)
(7a) In the instant case, it is apparent that appellant has failed to make a sufficient showing of disparate treatment under either the federal approach or the one adopted by the Commission. He failed to complete the application process. Therefore, he does not meet the second prong of requirements under McDonnell Douglas  e.g., a showing that he "applied" for the job. Nor is it possible, as a result, for him to establish a causal connection between his protected status and the adverse employment decision.
The need to complete the application process in order to state a claim of discrimination by disparate treatment, was underscored in Tagupa v. Board of Directors (9th Cir.1980) 633 F.2d 1309. In Tagupa, plaintiff, in response to a job advertisement, sent defendants his resume and a cover letter. The resume was not prepared for the purpose of applying for the position and did not set forth those areas of plaintiff's background that fit the advertised qualifications. Subsequently, defendants wrote plaintiff that while his resume was "impressive," it did not adequately address those qualifications specifically noted in the job description. Plaintiff sent a reply letter referring defendants *1329 once again to his resume and the references listed therein. Thereafter, defendants notified plaintiff that he did not get the job.
Plaintiff brought an employment discrimination suit against defendants under 42 United States Code sections 1981 and 1983. The trial court granted defendants' motion for summary judgment and the Ninth Circuit Court of Appeals affirmed. Analogizing plaintiff's action to one brought under title VII, the Court of Appeals held that a necessary element in the case is that "the plaintiff have applied for the job." (Tagupa v. Board of Directors, supra, 633 F.2d at p. 1312.) Concluding that plaintiff had not completed the application process "within the meaning of the guidelines laid down in McDonnell Douglas Corp. v. Green ...," the Tagupa court affirmed the summary judgment. (Id., at p. 1311.)
As in Tagupa, appellant here failed to complete the application process and, thus, make a proper showing. Subsequent to the initial rejection of his application for the position at issue, appellant wrote a letter of protest to the university. Upon receipt of the letter, the university looked into why appellant's application had been turned down. In doing so, it discovered that the criteria used by the search committee in screening the applications differed from the qualifications listed in the job announcement, whereupon it revised the criteria and reevaluated the applications. At this point, the university contacted appellant by phone to inform him that he was a finalist for the position and to invite him for an interview. The university told appellant that the position had not yet been filled and that it would not make a final selection of a candidate until all finalists had been interviewed. Despite this, appellant declined the interview. He thereby failed to complete the application process and to make the required showing as a matter of law.
Appellant asserts that he declined the interview because he had already filed a complaint against the university with the EEOC and was convinced, in view of this fact, that any interview would be unfair. He claims that the proffered interview was merely a pretext and that the selection of a candidate had already taken place. Such an assertion, however, does not relieve appellant of the burden of having to complete the application process where his claims are purely speculative and unsupported by the evidence.
(8a) Appellant has failed to present a prima facie case of discrimination by disparate impact as well. (5b) "A `disparate impact' plaintiff, unlike a plaintiff proceeding on a `disparate treatment' theory, may prevail without proving intentional discrimination. [Citations.] However, the requirements a disparate impact plaintiff must meet `are in some respects more exacting than those of a disparate treatment case. A disparate impact plaintiff "must *1330 not merely prove circumstances raising an inference of discriminatory impact; he must prove the discriminatory impact at is sue."' [Citations.] This is usually done by establishing `that an employment practice selects members of a protected class in a proportion smaller than their percentage in the pool of actual applicants.' [Citation.]" (Lowe v. City of Monrovia (9th Cir.1985) 775 F.2d 998, 1004.)
(8b) Here, once again, appellant makes highly speculative allegations without any real substantiation. He states that even though Filipino-Americans comprise the second largest group by national origin in the agricultural labor force, there are no Filipino-American farm advisors or specialists in the university's Cooperative Extension. (9) (See fn. 7.) These claims, however, are based on inconclusive and inadmissible evidence.[7] (7b), (8c) Meanwhile, he offers no evidence of any particular practice or policy on the part of the university which has had a disparate impact on Filipino-Americans, nor any evidence of what percentage of Filipino-Americans constitute the applicable pool of applicants. Without this, appellant has not stated a valid claim of discrimination due to disparate impact.
In sum, we conclude that, as a matter of law, appellant has failed to present a prima facie case of employment discrimination. Summary judgment is affirmed.
Scott, Acting P.J., and Barry-Deal, J., concurred.
Appellant's petition for review by the Supreme Court was denied July 29, 1987.
NOTES
[1] Although appellant couches his arguments in terms of title VII of the Civil Rights Act of 1964, it would appear that the case was brought under the FEHA. Appellant pursued his administrative remedies under both title VII and the FEHA. However, attached to the complaint below is a "right-to-sue" letter issued by the Department of Fair Employment and Housing which handles FEHA claims. Furthermore, it has been held that state courts lack jurisdiction over title VII matters, said matters being the exclusive province of the federal courts. (Valenzuela v. Kraft, Inc. (9th Cir.1984) 739 F.2d 434; accord Dyer v. Greif Bros., Inc. (9th Cir.1985) 755 F.2d 1391; Trujillo v. County of Santa Clara (9th Cir.1985) 775 F.2d 1359; see also Retired Public Employees' Assn. v. Board of Administration (1986) 184 Cal. App.3d 378 [229 Cal. Rptr. 69].)
[2] Unless otherwise indicated, all further statutory references are to the Government Code.
[3] The EEOC is the federal agency designated to handle title VII claims.
[4] "Section 12940 provides: `It shall be an unlawful employment practice, unless based upon a bona fide occupational qualification, or, except where based upon applicable security regulations established by the United States or the State of California: [¶] (a) For an employer, because of the race, religious creed, color, national origin, ancestry, physical handicap, medical condition, marital status, or sex of any person, to refuse to hire or employ the person ... or to bar or to discharge the person from employment ... or to discriminate against the person in compensation or in terms, conditions or privileges of employment....'"
[5] "[O]ur courts, while not bound, cannot overlook the applicable federal law in a significant and emerging area, such as [employment] discrimination...." (Prescod v. Unemployment Ins. Appeals Bd. (1976) 57 Cal. App.3d 29, 40 [127 Cal. Rptr. 540].)
[6] The relevant provisions of title VII of the federal Civil Rights Act of 1964 are similar to the FEHA and provide as follows: Section 703(a) (42 U.S.C. § 2000e-2(a)): "(a) It shall be an unlawful employment practice for an employer 

"(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
"(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin."
Section 703(d) (42 U.S.C. § 2000e-2(d)): "It shall be an unlawful employment practice for any employer, labor organization, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs to discriminate against any individual because of his race, color, religion, sex, or national origin in admission to, or employment in, any program established to provide apprenticeship or other training."
[7] To support his claim that Filipino-Americans make up the second largest group by national origin in the agricultural labor force, appellant cites U.S. Census statistics from 1960 and 1980 as to the percentage of Filipino-Americans in the general California population. To support his allegation that there are no Filipino-American farm advisors or specialists in the Cooperative Extension, appellant points to conversations he has allegedly had with various employees of the Cooperative Extension and his own findings in examining certain university personnel directories. As noted by respondents, none of this evidence is admissible under the hearsay rule and/or the requirement for authentication of documents. (Evid. Code, §§ 1200 and 1400.) As a general rule, inadmissible evidence can neither support nor defeat a summary judgment. (Craig Corp. v. County of Los Angeles (1975) 51 Cal. App.3d 909, 915 [124 Cal. Rptr. 621].)